Good morning. Welcome to the Sixth Circuit. The clerk may call the first case. Case number 15-5429, Jackson Brumley et al. v. Albert Brumley and Sons et al. Oral argument by the District Attorney for Fives, Mr. Slotnick for the appellant. Good morning, Your Honors. My name is Barry Slotnick of Loeb & Loeb, and I represent the appellants. When Goldie Brumley re-granted her rights in I'll Fly Away in 1979 to Albert E. Brumley and Sons, superseding the 1975 grant from her and her husband, at a time when she had the present right to serve a termination notice, she precluded the plaintiffs, other heirs of Albert Brumley Sr., from subsequently attempting to terminate the author's 1975 grant during the second termination window. Both the District Court and plaintiffs have acknowledged the validity of Goldie's assignment, yet plaintiffs urge this Court to do something that no other court has ever done, and that is to decide that a controlling heir's post-1977 grant leaves a window open for a later termination by other heirs, and effectively terminating a post-1977 grant by an heir, which is not subject to termination under Sections 304D or Section 203 of the Copyright Act. One kind of orienting principle is, you know, for all the Copyright Act intricacies, tell me if you agree with me that this really is a case that comes down to contract interpretation, in terms of what the 1979 assignment did or didn't do. We know we have the 1975 agreement. The 1979 agreement could extinguish it. That's possible. But isn't this case really contract interpretation? Well, as a copyright lawyer, I'd like to never think that anything is just left to copyright interpretation. No, no, no. Contract interpretation. But I believe that certainly one has to look at the contract and under state law in Missouri, which basically says, different from New York and California, that where you have an agreement between the same parties dealing with the same subject matter, and then have a subsequent agreement of the same parties and the same subject matter, that the second agreement automatically supersedes the first. Was that automatically part? I'm not sure why that's so. Why isn't it possible to, you have your 1975 agreement. They realize, I mean, look at it. It's not very long, the 1975 agreement. It looks like a back of the envelope type thing that someone then decided to type and sign. It doesn't even have commas. This one isn't a whole lot better, but there's a little more to it. And so you could see them saying, well, we're doing this because of concerns about derivative works or other types of copyright interests that they could well have had, the two sons might have had. So it's not obvious to me that 79-1 as opposed to adding to 75 supersedes it. That's something I don't quite understand. Okay. I would agree with Your Honor that neither agreement is the model of what a perfect assignment should look like. Indeed, the 1975 agreement, which, of course, was signed prior to the enactment of the 76 Act, basically treated copyrights the same way it treated office furniture and copying machines. It was just another add-on. It only talked about we're selling our copyrights. It didn't talk about which copyrights, and it didn't talk about what interest in copyrights. The 1979 agreement is somewhat better in that it specifically dealt with renewal rights, which was not mentioned in the first, and it mentioned future rights, which, frankly, the most significant right that Goldie Romney had in 1979 was the right, the present right, to assign the termination right, as it were. Did that assignment say something about termination rights? It didn't, Your Honor, and the courts have held, most recently, the D.C. Comics case in 2013. The Ninth Circuit made it very clear that there is no federal requirement, there is no statutory requirement for intent to be explicit within the document. Indeed, Missouri law makes it very clear that you have to read the agreement in some fashion which will not create a nullity. But you've already established it doesn't create a nullity because you just acknowledged the 1979 agreement dealt with some topics the 1975 agreement didn't. So we've already cleared that hurdle, haven't we? We would like to think so, and that was the big distinction between the Mewbourne case— Why do you think that helps you? I'm thinking it hurts you because your argument is you've got to give some content to the 1979 agreement. And I guess what you say is the only way to give content to the 1979 agreement is that it supersedes the 1975 agreement. But I would think it's just as possible to say, no, no, the 1975 agreement is still there. The key thing about the 1979 agreement is it adds some rights. It deals with, say, renewal rights. That doesn't prove it supersedes, number one, and it doesn't prove it addresses termination rights. Well, of course, in 1979, I'll Fly Away was already in its renewal term. So there was no purpose for there to be a reference to renewal. Congress, who knows what Congress is going to do, right? And derivative rights in the future. Well, derivative works would be excluded from termination no matter what. No, but you're making it sound like all they cared about was termination. That's not necessarily so. I mean, it's quite possible the 1979 agreement is by people that are ignorant of the 76 Act. It's quite possible that most people who sign these are ignorant of the 76 Act. Exactly. And your smile reveals just what I'm thinking. They had no idea what they were doing. Well, I think they did. I think there are certain things that we know, and unfortunately Mrs. Brumley is no longer with us to explain what she did. What we know is that in 1979, Goldie Brumley, as the owner of the rights, as the 50% shareholder owner of termination rights, as the sole beneficiary, testamentary beneficiary of her husband, transferred copyright ownership to the two sons that she wanted to own the copyrights to the extent there were any deficiencies in the earlier agreement. Those deficiencies were addressed by Mrs. Brumley. Otherwise, there would have been no purpose for her doing this at all. You know, intent is, we don't think intent is a significant factor, but the one thing we know about the 1979 agreement is that Goldie Brumley wanted her children to own these copyrights and wanted her children, William and Robert, to own these copyrights. She didn't want them all to have it. I'm sorry, Your Honor? She didn't want them all to have it, right? She didn't want them all to have it, no. So, you know, what did she give them that she didn't already have given them earlier? Well, because the 1979 agreement was within the statutory termination window under Section 304C, she gave them the only thing that she could give them was the specific right to own these copyrights, irrespective of a right of termination. That's what the 1979 act, had she not signed that agreement, then there would have been possibilities of termination. You argue, citing a Missouri case from, I think, 1882, that you don't have to look at whether she intended to bargain away her termination rights because you can assume that it supersedes, that this supersedes the prior one. I'm struggling with that argument based on recent Missouri law that indicates if you're going to claim a novation, then the recent cases require evidence of the party's intent to enter into that novation, and that it is your burden to show that. I don't think we can assume that she intended to take care of the termination rights since there's no writing that says that. How do you square the argument that we can assume that with the recent law in Missouri? Your Honor, I'm not familiar with the recent law in Missouri. All I can say is that under— It's novation law. It's novation law, yeah. Novation law, I think, is what she's referring to, yeah. Your Honor— It would be your burden to show it, and we cannot assume it since it's not written in. How have you carried your burden to show that it was an intentional novation? Because, Your Honor, the only right that Mrs. Brumley had in 1979 was the right to extinguish and divest the termination right. But if intention is at issue, then you would have to show that she understood that or had some sort of—you would have to have evidence that that was her intention, and I'm not finding that in the record, and I think that's your burden. I understand, Your Honor. Okay. Well, you say her only right in 1979 would have been giving up the termination right, but that kind of goes back to what we were talking about before. That assumes everything was taken care of in 1975. If there were—she could give other rights that were not mentioned in 1975, right? I guess I'm just not following— Well, in—I'm sorry, Your Honor. In 1975, there was no termination right. There was no 76 Act. There was no right to termination. I understand that, but I'm making the point that the 1975 agreement doesn't necessarily cover the waterfront of rights that the husband and wife could have given to the two sons and to the extent things are not addressed in 1975 that she addresses in 1979, that shows that it's not quite accurate to say the only thing she could assign in 1979 was a termination right. Your Honor, I'm not sure what other rights there were in—that weren't granted in 1975. No, that's what I was saying before, rights in the future. The 1975 agreement doesn't say anything about in the future. Well, the 1975— The 1975 agreement does. The 1975 agreement makes reference to the sale of copyrights. The sale of copyrights, absent anything else, is all right, title, and interest in the copyrights. All of our right, title, and interest in the following describe personal property. It doesn't say anything about the future? It doesn't say anything about derivative rights? No. It doesn't say anything about renewal rights? Your Honor, any time—I'm sorry, Your Honor. Any time that you assign a copyright, you're not assigning past rights. You're assigning future rights. You're assigning the right to own that copyright for the duration of copyright. And what was changed in 1976 is what the duration of copyright was. And the duration of copyright became, instead of two terms of 28 years, it became a life plus 50 and then life plus 70. What about this variation on Judge Stranch's question that if there's one thing we know about the 76 Act in terms of legislative intent, is they were unhappy with how the renewal right regime had worked, that it had unfairly allowed publishers to get the renewal right and the copyright at the same time, and they were too lightly contracting these things away. If one thinks of Congress focused on that problem, wouldn't you think Congress would expect courts to be careful about saying someone after 78 had contracted away a termination right? Wouldn't you want a little bit of—instead of presuming that it happened, wouldn't you prefer to see some clarity that that's what they meant to do? May I answer? Oh, yeah. Yeah. Thank you. I think that Congress was trying to address the concerns that were raised by the Fred Fisher case in 1940. That in 1940, one could assign not only their original term of copyright, but the renewal term of copyright as well. What Congress tried to do is create a regime under which, at a certain point in time, under Section 304— I got all that. I'm trying to say, doesn't that lead one to the conclusion that that policy choice should make courts skeptical of too lightly concluding someone had contracted away, assigned a termination right after 78? Well— I understand what happened. Okay. I think I understand what happened. I'm asking, what happened? Doesn't that lead to this conclusion? No, I don't think so, Your Honor, because I think that, again, it may have led to that conclusion if instead of this being signed in 1979, it was signed in 1943. What you have happening here is that— Well, the 43 is easy because that's the agreement to the contrary. That's correct. The agreement to the contrary language solves that problem. Okay. That doesn't— So we're all in agreement that this is not an agreement to the contrary. Well, I'm going to follow up on that, but let's stick with the question I've asked right now. Doesn't the policy—the one policy conviction we know Congress had was about, just as they were anxious about too lightly letting authors give up rights to renewal, we don't want the same problem to have with termination rights, which would seem to lead to a situation where when you're not sure what an agreement does, you should conclude it doesn't give up this key right. It was the key point of the 78. Your Honor, I think that's—obviously, that's correct. The issue, however, is what do you do in 1979 when you have a widow with 50 percent of the termination right and six children with 50 percent of the termination right? It would seem incongruous for the widow who wants to transfer and make sure that her children, her two sons, own the copyrights for the duration of copyright, to send a termination notice, which, by the way, would have been ineffective. So what I think Your Honor is saying is that had there been a specific reference to termination in the 1979 grant— A reference to assigning her termination rights. Okay. But that's a 50 percent interest. She doesn't have a right to terminate. She just has an interest in that. She has a blocking right. As this case shows, it was pretty valuable. It is pretty valuable, but it's a 50 percent blocking right. So what I think Your Honor is saying, and I don't think Congress was saying, is we expect there to be, almost writ-like, that there has to be a specific reference to termination, especially when the party making that reference doesn't own the termination right, owns only half of it, not sufficient to terminate. So I think that Congress was trying to address this, perhaps not particularly well, and certainly not in a situation like this. What about—so the last question I have for your rebuttal is, if you just look at the plain language of the statute, why isn't this an agreement to the contrary? I mean, I think you take the view that, well, agreements to the contrary are really referring to pre-'76 or 78 agreements, but of course, as much of the cases seem to suggest, after 78 you can contract this away, but I'm not sure that's what the language of the statute says. And I think Nimmer, who supposedly knows a lot about this area, thinks that language covers a situation like this. So what do we do with the language of the statute? Well, Nimmer supposedly knows the answer. I think that Nimmer also suggested that there needed to be one free moment of time between the termination and regrant. So he had a lot of bad ideas, that's your point? Excuse me? He had a lot of bad ideas, is that your point? I'm saying that he has some bad ideas. I think that in this context, however, Your Honor, Congress has made it very clear, and even Newborn, in citing the history, the legislative history, said that Congress did not intend for the ability to enter into contracts to be limited in any fashion whatsoever, that parties were free to deal with these issues contractually. One looks at an agreement, almost, in this context as an aberration. It's not an aberration. What it is, is the way everyone does business in this business all the time. It is a very valuable right to have a termination right. But that termination right under 304C happens 56 years after the fact. Under 304D, it's 76 years after the fact. It's a valuable right, no doubt, but it's 56 and 76 years later. Do you view it as agreement to the contrary only applies to agreements before the 76 Act? No, I think that you have to look at pre-78 agreements one way. I think you have to look at post-78 agreements a different way. And I think once you have an agreement post-78 that is within the window of opportunity to terminate, you have to look at that differently, the same way that they looked at it in Steinbeck, the same way they looked at it in Milne, the same way they looked at it in DC Comics, and frankly, it's the same way they looked at it in Mewbourne as well. All of them start with the same basic principles of what is or is not a termination right. Mewbourne went off on different facts, which are totally different from the facts in this case. Any other questions? Thank you, Your Honor. Mr. Crane. Good morning, Your Honor. It's Larry Crane. I'm here on behalf of the Brumley Heirs. There are strong policy reasons. I want to address a question that Your Honor asked Judge Sutton. I believe that there are strong public policy reasons to undergird and affirm the decision of the district court for this reason. The right of termination, as we all know, was enacted to give a second chance to the author and to the heirs. It's an important right and one that should not be casually or impliedly waived or relinquished in agreements like the one signed by Goldie in 1979. It would defeat the purpose of the 1976 Act, we believe, if a widow could assign away a right of termination before it had even vested and in an agreement that is singularly silent as to that important right. Do you think she had to put in there, I want to give up my rights to terminate? I think she either had to put it in there, Judge Seiler, or there had to be circumstances that made it very clear that that was the inference to be drawn, that she understood that she was giving up that right. Because every case that we've looked at, the Milne case, the DC Comics case, the classic Muborne case, all of them stand for the proposition that a subsequent agreement does not automatically supersede, as my respected adversary argues, it does not automatically supersede unless there is clear language to the intent of the parties to do so or that there are circumstances that there could be no other fair inference drawn. In other words, it would have been clear that Goldie had intended to leverage, as the cases we've looked at, leverage that right of termination in a better agreement. But one way of putting his argument is, okay, fine, maybe the 1979 agreement doesn't specifically mention it, but it is hard to understand what's left of the 1975 agreement. And so as a matter of contract interpretation, I wouldn't consider it unfair to say 79 supersedes 75. In other words, if there were ever any disputes about what Goldie and others had, you just wouldn't look to 75. You'd look to 79. And if that's true, that's problematic because even if 79 doesn't mention termination, if it supersedes the 75 agreement, then you're in a world where you don't have a pre-78 agreement to terminate, and that's just as bad for you. So why can't you come at it that way, which I think is hurtful to your position? But what's the answer to that? Well, I think if you do come at it that way, you have to say that the 1979 agreement, which does go further than the 75 one to assign future renewal rights, means nothing. And it clearly does. It clarifies, it upholds, it affirms the 1975 agreement. But why doesn't it supersede it, though? It covers, I mean, it's almost like a Venn diagram. This is 75, and then 79 enlarges, so 75 is gone. And if 75 is gone, you're without a pre-78 agreement. And that is the sole justification for the appellant's argument, as I understand it. And what they've done is try to go back to archaic Missouri law to say that somehow it automatically supersedes. If you read those cases, Your Honor. You would say if there were dispute about the rights that had been obtained from Goldie and Albert, you would say even today you would look to the 75 and 79 agreements. In other words, forget termination, just rights about royalties. And you would say both agreements would still be relevant? They should be read in tandem with each other. And the reason is if you look at the Missouri cases cited by the appellants, those cases stand for the same Hornbook contract law that exists in virtually all states, possibly with the exception of New York, that the parties can enter into innovation. It's done all the time in real estate contracts. You simply say we extinguish the old contract and we substitute in its place this new agreement. That was not the intent, nor was it expressed anywhere in the 1979 agreement by Ms. Goldie Brumley. And it's important to note also that Ms. Brumley's right was not vested at the time she signed this agreement. I think it's a fair inference that she probably didn't know or appreciate the fact when she signed this 79 agreement that she— You mean it wasn't vested? I mean she had the—by 79, she had the 50 percent termination interest. She only had a 50 percent contingent interest, may it please the Court. As Judge Seiler wrote in the case of Roger Miller Music, this Court has held that— She would have agreed that at that point she could sell her 50 percent contingency interest if she was clear about it and there was consideration. What would it have been worth, though, without at least cobbling together one of her children? Because she could not— I would have paid fair money for it. I would have made some money for that. All she had until she—as this Court has previously held, until you exercise the right, though, it's not a right that is vested in the sense that she could have exercised it. But it's assignable and sellable, isn't it? It would have been assignable. But the important distinction here, and the reason I bring this up, is that in the Milne case and in the Steinbeck case, in the Milne case, Christopher Robin Milne had a present vested right that was eminent and could have been exercised by him alone. I understand what you're saying. I don't understand how it drives this case. Okay. At any rate— What else might drive this case? Your opposing counsel would suggest that there is clear evidence of intent of a mother who wants to protect the legacy of her family. She doesn't want it divided over six people. She wants to know that someone's in control of I'll Fly Away. Why is that not an obvious intention that we can draw from the entry of the 1979 agreement? Well, had she chosen to do that in a testamentary instrument or some other instrument that would have given that intent, I can't read that into the agreement itself. Now, clearly there was some favoritism going on as far as the mother choosing these two sons. Well, perhaps it was not favoritism. Perhaps it was pragmatism. What she was thinking was, I want one or two in charge of what's the biggest moneymaker that this family is ever going to see, and I want to be sure that it is promoted and protected the way it ought to be. That's not an exclusionary necessarily concern. It's a protection of a legacy concern. I think that's what your opposing counsel is arguing. And I understand the argument, but had that been a maternal concern on her part to preserve that family heritage, wouldn't it make sense that she would have at least gone to the trouble of specifically naming that right? It was the only thing that had real value at the time. It would seem to me that if it was that important a consideration, that she would have taken the steps necessary to at least consult with a lawyer. And maybe she did. I don't know. But that should have been pointed out. We respectfully submit. Let me go back to congressional policy on Judge Stranch's point. One thing I'm pretty sure Congress was not interested in was precipitating intra-family disputes. They were worried about people outside the family ripping off people within the family. It's ironic the way the law is being applied here. Absolutely, Judge Sutton. And I think the family context is an important one in this case because there was nominal consideration both in 1975 and 1979. I thought in 1975 it was $100,000. Well, for the transfer to the publishing company, it was $100,000. That's correct. And certainly when the brother, William, later transferred all of his interest to his senior brother, it was, I think, $400,000 that changed hands. $79,000 was a dollar. Right. $79,000 was a dollar. You decided that the subsequent agreement there that Governor signed supersedes the first? Or is it an ovation? What does that do to your case? Well, if the court should find that indeed the second agreement is a superseder and completely relinquishes or extinguishes completely the 1975 agreement, then I think, frankly, the Bromley heirs are in some difficult waters to chart through. You're going to have to find another lawyer because I don't know it either. Even without saying the word termination in the second document. There's no word of termination anywhere in that document. I realize the statutory language agreement to the contrary, in one sense, it's in your self-interest and your client's interest to say, oh, that applies to everything. I don't care when it is. But being reasonable, that just seems like that can't be it. It seems to me, I mean, I assume you think the Milne and Steinbeck cases were correctly decided, and those were cases where you could call those agreements to the contrary, but what ended up happening is they got serious money, and so those courts pretty lightly say, well, of course you can do this, despite what Nimmer says. Do you think we should look at it as, well, the way to think about this is clearly, if it's a pre-'78 agreement, you just follow the language. If they purport to sell something, that does not count. That's exactly what the agreement to the contrary language is about. And then would you say post-'78 agreements, you then just engage in contract interpretation, number one, to see if they meant to sell it, and then if they did, and fair consideration, then it's enforceable without regard to that language. Is that how you would look at it? Yes, Your Honor. I think that's how we would view it. I think there is a distinction to be made between pre-'1978 assignments and post-'78. And I think the Milne, to answer your question, the Milne case and the Steinbeck cases were decided correctly. They just were a far cry from what we have here in this case, as the classic media case court held that those situations are far different, where there was an immediate imminent threat of the right of termination, and the parties clearly took that into account and even expressly referenced it in some instances, where the parties were clearly focused. Their focus was on that right of termination. Here it was not. So if that's true, that makes Mewbourne kind of irrelevant, because that happened before the window. Isn't that technically, you know what I'm saying? Because Mewbourne, as I understand it, and I thought that your friend on the other side made this point pretty clear in his brief, that in the Ninth Circuit's analysis in that case, it was clear that the supposed – well, the agreement was before the termination window had opened. So it really counts as a pre-'78 case. Well, Winifred Mewbourne could not have – it's true that she could not have exercised her right of termination. She couldn't even give notice for six years at the time of the 1978 – excuse me, the 1976 agreement she entered into. And two years later in 78, she and her other two sisters enter into a new agreement that assigns again, as your Honor recalls, the motion picture, TV, and radio rights, which the court said were the same as those in the earlier agreement. But there was a more expansive right in publication and royalty recovered. So the court in Mewbourne – So pre-termination window, whereas this case, unhappily for your side, happens during the termination window. That's what makes your case a little harder than Mewbourne. Granted, it occurred during the first termination window set by the statute. However, I don't think that – I think it is still a critical distinction that in both of those cases, the Milne case and in Steinbeck, the person who was assigning that right of termination alone had the right, eminent right, to exercise it. And in this case, that wasn't the situation. Goldie would have had to go on to one of her six children. So I think the class – It seems unfair. I think I'm asking the right party this question. But isn't – if you win under the district court's decision – So it's William that sold his interest in the company, his share in the company. I realize it was stock. It doesn't say anything about termination rights. I get all of that. But boy, it sure seems unfair that he pays all that money. I mean, or that exchange happens, and then you're still going to get a situation where his heirs are going to – So, in other words, William collects $400,000 for the sale. So that's a pretty good deal. And now his children are going to participate in that termination right interest? That seems like a windfall to me. I understand the technical point about I only sold his share in the company. That has nothing to do with termination right. I got it. But it happened at a time where termination rights existed. And it just – I don't know. It just – it seems like a windfall to me intuitively, and I don't know the legal answer to that problem. I don't know that there is one. I haven't contemplated that – the fact that there would have been a windfall. $400,000 is a sizable share or remuneration for his share, rather. And the other four children or their heirs, whom I represent, certainly have not seen any consideration from this home. So you don't represent William's children. I guess that's right. Right. Unless there are other questions. Thank you, Your Honor. Thank you. Mr. Slotnick. Thank you, Your Honor. I'd like to correct two quick things. Steinbeck is exactly the same situation as Brumley in that it was the widow who had a 50 percent interest. So the widow had 50 percent. She didn't have 51 percent the same way that Goldie didn't have 51 percent. And Mr. Crane does represent William's children in this case. So it is a windfall for them to – He said he didn't represent. I thought he represented. They've been representing him so far throughout all of this litigation. Anyway, so, okay, you agree with me it's a windfall. Now give me the legal tools to deal with that problem because I don't think – Again, it was – To be clear, in 86, there's nothing about that transaction that's about termination rights. It's about shares in the company. They were selling half of the company. They were selling the copyrights in that company or his rights to those copyrights. And consequently, it is unfair to terminate a grant that was made within the window of opportunity yet again. I can't say that this was a model of copyright clarity, but it clearly was a transfer within the window by William the same way that it was a transfer by Goldie within the window. The problem with this case, frankly, Your Honor, from both sides, is that this is not the poster child for copyright termination. We try to shoehorn it in because we have no other choice, but the fact of the matter is the goal of Congress in enacting the statute was to prevent authors and their heirs from being taken advantage of by third-party assinees or by not understanding – For their siblings. Different statute, I suppose. That one hasn't been drafted yet. The fact of the matter, Your Honor, is that Albert Brumley Sr. solved the problem of unremunerative transfers in 1947. He sold his copyright to Hartford Music in 1930, and then within 15, 20 years, he bought the company. So he solved that problem. So everything that Congress was worried about was addressed by Albert with his own self-help. He bought the company. He took care of the company. He brought his two sons into the business. I totally get the argument. It's just there's no language in the statute that gives you traction with it. That's the problem. Your Honor, I think there is language in the statute. I think it is clear that the statute and legislative history make it clear that one wants to allow transfer agreements to be made between parties. As I was saying before, Your Honor, the right to terminate happens 56 years later. How many works of art, how many copyrights are there from 1930 that we're still whistling, that we're still listening to on the radio? Very few. It is a real right, and it has real significance with respect to certain works. But in the normal day-to-day operation of the copyright industries, if a songwriter enters into a deal with a music publishing company for a work like I'll Fly Away, and the publisher now wants three or four or five years later to enter into a new agreement for new songs, what typically happens is the writer says, We'll be glad to sell you our new songs, but we want to renegotiate the first deal. Now, what I think the— So your red light's been on for a little while, so you can complete this point with a sentence or two with not that many dependent clauses. Tough, tough, Your Honor. There is a need to benefit authors by allowing them to renegotiate their deals during the lifetime of the copyright. And then for those fortunate works that have the ability to have value after 56 years or 76 years, the right to terminate. Goldie did it. She did it in clear language. She didn't use magic words, but she made it very clear who she wanted to own these works. And whether that's under federal law or state law, that contract should be upheld and not be treated as a nullity. Thank you, Your Honor. Thanks to both of you for your excellent briefs and arguments. That's a really interesting, tricky case, so we appreciate the help you've given us in deciding it. Thank you. The case will be submitted, and the clerk may call the next case.